UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------X
KIMBERLY K. GROFIK,

                Plaintiff,

                                    <u>MEMORANDUM & ORDER</u>
    -against-                       19-CV-1238 (JS)

COMMISSIONER OF SOCIAL SECURITY,

                Defendant.
------------------------------------X
APPEARANCES
For Plaintiff:       Howard D. Olinsky, Esq.
                    Olinsky Law Group
                    250 South Clinton Street, Suite 210
                    Syracuse, New York 13202

For Defendant:       Candace Scott Appleton, Esq.
                    United States Attorney's Office
                    Eastern District of New York
                    271 Cadman Plaza East
                    Brooklyn, New York 11201

SEYBERT, District Judge:

      Kimberly K. Grofik ("Plaintiff") brings this action pursuant to Section 405(g) of the Social Security Act, 42 U.S.C. § 405(g), challenging the Commissioner of Social Security's (the "Commissioner") denial of her application for social security disability insurance benefits. (Compl., D.E. 1.) Pending before the Court are the parties' cross-motions for judgment on the pleadings. (Pl. Mot., D.E. 9; Comm'r Mot., D.E. 12.) For the following reasons, Plaintiff's motion is GRANTED and the Commissioner's motion is DENIED.

BACKGROUND[1]

I.   Procedural History

On September 1, 2015, Plaintiff filed for disability insurance benefits, alleging that since October 27, 2014, Myasthenia Gravis, Multiple Sclerosis, Lupus, Rheumatoid Arthritis, Raynaud's Syndrome, and Migraines have rendered her disabled.  (R. 56.)  After Plaintiff's claim was denied on November 17, 2015 (R. 70-73), she requested a hearing before an Administrative Law Judge ("ALJ") (R. 82-83).  On December 4, 2017, Plaintiff appeared with her representative by video teleconference for a hearing during which a vocational expert testified.  (R. 35-55.)  In a decision dated February 7, 2018, the ALJ found that Plaintiff was not disabled from her alleged onset date of October 27, 2014, through the date of the decision.  (R. 13-34.)  On January 3, 2019, the Social Security Administration's Appeals Council denied Plaintiff's request for review and the ALJ's decision became the final decision of the Commissioner.  (R. 1-7.)

Plaintiff timely filed this action on March 1, 2019 and moved for judgment on the pleadings on August 6, 2019.  (Pl. Br.,

_____

[1] The background is derived from the administrative record ("R.") filed by the Commissioner on June 7, 2019.  (R., D.E. 8 (containing pp. 1-317) and D.E. 8-1 (containing pp. 318-588).)  For purposes of this Memorandum and Order, familiarity with the administrative record is presumed.  The Court's discussion is limited to the challenges and responses raised in the parties' briefs.

D.E. 9-1.)  The Commissioner opposed Plaintiff's motion and cross-moved for judgment on the pleadings on October 7, 2019.  (Comm'r Br., D.E. 12.)  Plaintiff opposed the Commissioner's motion and replied in further support of her motion on October 28, 2019.  (Pl. Opp., D.E. 15.)

II. <u>Evidence Presented to the ALJ</u>

The Court first summarizes Plaintiff's testimonial evidence and employment history before turning to the Vocational Expert's testimony and Plaintiff's medical records.

A. <u>Testimonial Evidence and Employment History</u>

At the time of the December 4, 2017 hearing, Plaintiff was 43 years old and had completed four years of college.  (R. 56, 202.)  She testified that she lives with her husband and two children, who were aged 11 and 16 at that time.  (R. 43-44, 46.) Plaintiff had been working as a receptionist at a doctor's office for about a year and a half when she stopped working in October 2014.[2]  (R. 42.)  Prior to that time, Plaintiff had been diagnosed with Lupus.  (R. 40.)  Although Plaintiff was on "[l]ots of medications" (R. 40), she testified that she "was missing a lot of work due to my weaknesses, [I was] unable to perform my job duties."  (R. 39.)  Plaintiff described having difficulty picking

---

[2] Plaintiff testified that her immediate prior employment was also in a doctor's office and that she "ran the front desk."  (R. 42-43.)  Plaintiff testified that she also worked part-time for a psychologist "managing the[ ] office."  (R. 43.)

up the telephone due to weakness in her arms and testified that "picking the phone [ ] up a hundred times a day, just was killing my neck, my arms. It just became way too much."   (R. 39.)   In addition to using the telephone, Plaintiff described that her job duties required her to "pull the charts for the day" and "have to put the charts back."   (R. 42.)   Her job duties also included collecting payments from patients and converting the patient charts into electronic medical records because the office began e-filing.   (R. 42.)   Plaintiff testified that she needed to take about four rest breaks during the day that each lasted about ten to fifteen minutes.   She described having to leave work early due to her symptoms and estimated that she left her work shift early about two days per week.   (R. 42, 51.)   She also estimated that she would miss work altogether approximately twice per month because of her ailments.   (R. 51.)

According to Plaintiff, when she had "flare-ups," she had weakness in her legs, constant fatigue, and difficulties with her vision as well as "eye[lids] drooping." (R. 39, 41, 48.)   She also testified that she suffered "facial pain" that "went to my jaw, would go to my ears" and would cause her to slur her speech occasionally.   (R. 41, 48.)   Plaintiff described her weakness in her lower extremities as something she experienced "every day" and "all day," saying it is "something I wake up with [and] that's something I go to bed with."   (R. 41.)   Plaintiff also testified

4

that she had difficulty swallowing and had daily tension headaches
that caused her "vision [to] get[s] blurred."  (R. 45.)

After Plaintiff stopped working, she described a typical
day as beginning at 3:30 a.m. or 4:00 a.m. because she "do[es]n't
sleep well at night."  (R. 43.)  She explained that she would help
get her children off to school and then she would go back to sleep
and "[w]ake up around the time they come home or a little before
that." (R. 43-44.)  According to Plaintiff, her husband worked in
the City until late at night so her older son "helps me a lot."
(R. 44.)  As far as housekeeping and chores, Plaintiff testified
that she has someone come into her home to clean every two weeks
and her husband helps with the laundry and takes Plaintiff food
shopping on the weekends because she "can't go by [her]self."
(R. 46, 50.)  She described being unable to push the shopping cart
and getting dizzy, having headaches and leg weakness during long
shopping trips so she felt safer going with her husband.  (R. 50-
51.)  Plaintiff testified that her older son feeds "the animals"
and helps with their care.  (R. 46.)

Plaintiff also testified that she was taking "[l]ots of
medications" for her immunity disorder and nerve pain but was not
able to tolerate some of them and she would be "sick to her stomach"
and vomit.  (R. 40.)  She described being "in the bathroom four or
six times a day" because of her nausea.  (R. 41.)  To remind her
to take her medications, Plaintiff set timers on her phone.  (R.

47.)   Because the oral medications also often "stopped helping" after a few doses, beginning in January 2015, she started having IVIG infusions at her "home two times a month with a nurse, eight hours a day." (R. 40, 44, 50.)   The infusions also "helped, then they stopped helping" so her doctors "replaced them with another medicine for myasthenia gravis." (R. 40.)   Plaintiff also testified that she was taking steroids to treat her symptoms but they caused her to have "rapid heartbeats" and disrupted her sleep and made her "overall not feel[ ] good." (R. 50.)

Because of her condition, Plaintiff testified that she no longer does any volunteer work in the community and she gave up her position as Committee Chair for the Cub Scouts because "it was becoming too much for me.  I just couldn't concentrate long enough to handle all the duties that were expected of that type of position." (R. 47.)

   B.   Vocational Expert's ("VE") Testimony

A VE testified as to Plaintiff's past work history. (R. 52-54.)   He testified that Plaintiff's first DOT job title was that of "customer services manager, 187.167-082, 187.167-082, light work, SVP is 8 skilled." (R. 52.)   He described her next job title as "executive assistant, 169.167-010, 169.167-010, sedentary work, SVP of 7, skilled." (R. 53.)   Plaintiff's last job title that he testified about was "receptionist, 237.367-038, 237.367-038" which he described as "sedentary work, SVP of 4, semi-

6

skilled." (R. 53.) The VE then testified that, a person with "the same age, education and work experience as the claimant" who could perform work at a sedentary level of exertion as defined by the regulations, would be able to perform Plaintiff's prior "work as an executive assistant office manager and receptionist" but not the work as a customer services manager. (R. 53.) He further testified that no jobs are available for such a person who is absent from work four times per month and/or off task fifteen percent of the day in addition to regularly scheduled breaks. (R. 53-54.)

C.  Medical Evidence

In addition to the testimony from Plaintiff and the VE, the ALJ also reviewed Plaintiff's medical records. Plaintiff received her medical treatment and diagnoses as relevant to this matter from: (1) Prem C. Chatpar, M.D., a rheumatologist; (2) Christopher Sinclair, M.D., a neurologist; (3) Miguel Delgado, M.D., a psychiatrist; (4) Sophia Boulukos, M.D., Plaintiff's primary care physician; (5) Vincent Sperandeo, D.N.P.; (6) Susan Shin, M.D.; and (7) Paul Herman, Ph.D. Plaintiff visited the emergency room at John T. Mather Hospital (the "Hospital") on two occasions during the relevant time period and those records were also before the ALJ.

Dr. Chatpar, a rheumatologist, first saw Plaintiff on February 24, 2014 on referral from Dr. Boulukos. (R. 321.)

Plaintiff had been suffering from chronic jaw pain and she was referred to Dr. Chatpar for "evaluation of bone loss in her left jaw." (R. 321.) Dr. Chatpar saw Plaintiff frequently throughout 2014-2016 for treatment of pain in her arms and fingers and for weakness and pain in her legs. (R. 277-79, 281, 300-305, 318-361, 569-588.) Dr. Chatpar's arterial doppler duplex imaging report from April 19, 2014 reflects that Plaintiff presented with bilateral "severely restricted flow" to her "wrists, hands, [and] digits. Inflammation noted." (R. 334.) Dr. Chatpar indicated Raynaud's syndrome as a cause of Plaintiff's symptoms. (R. 334.) Plaintiff saw Dr. Chatpar again on June 16, 2014. She noted Plaintiff's "worsening neuropathy" and ordered further testing. (R. 335-40.)

Plaintiff next saw Dr. Chatpar on October 20, 2014 following two fainting episodes within the previous two weeks. Plaintiff also reported shortness of breath, dizziness, frequent headaches, chest pains, chronic pain in her legs and feet (particularly on the left side) and difficulty getting out of bed and walking. (R. 341.) Upon examination, Dr. Chatpar noted that Plaintiff had a positive antinuclear antibody result (ANA) and indicated an impression of arthritis, degenerative disc disease, and fibromyalgia. (R. 343.) On December 15, 2014, Plaintiff returned to Dr. Chatpar with complaints of weakness in her arms and legs as well as constant headaches. (R. 344.) Upon

examination, Dr. Chatpar continued her diagnosis of arthritis, degenerative disc disease, and fibromyalgia and advised Plaintiff to see a neurologist.   (R. 345-46.)   On February 11, 2015, Plaintiff saw Dr. Chatpar complaining of a "Raynaud's flare [up]" with "numbness and tingling to the hands – mostly the fourth and fifth digits" which sends "pain radiat[ing] up her arms."   (R. 347.)   Plaintiff also continued her complaint of headaches and indicated that "her ears are ringing." (R. 347.)  Upon examination Dr. Chatpar objectively noted that Plaintiff's feet were tender to palpation and again indicated Plaintiff's symptoms are likely the result of arthritis, degenerative disc disease, and fibromyalgia and noted that Plaintiff reported she would see a neurological specialist in April 2015.   (R. 348-49.)   On March 23, 2015, Plaintiff again presented to Dr. Chatpar with "numbness, pain and weakness in [ ] both hands.  These symptoms have been present for a few years." (R. 300, 328.)  Upon examination, Dr. Chatpar noted that Plaintiff's "left elbow is tender on palpation" and ordered further testing to "rule out any Raynaud's changes or vasoconstriction." (R. 325.)  Plaintiff's EMG/NCV testing reflect some abnormalities and Dr. Chatpar's impression is that Plaintiff has "a very mild compromise" of both the left and right median nerves at the wrists. (R. 300, 328.)

Plaintiff then began treatment with Dr. Sinclair, a neurologist, on April 8, 2015.  (R. 286-88.)  Plaintiff reported

a 2001 diagnosis of multiple sclerosis ("MS") and complained of bilateral leg pain and muscle aches and weakness. (R. 286-87.) Plaintiff complained of difficulty walking and having numbness and tingling in her hands and feet. (R. 286.) Plaintiff also reported Dr. Chatpar's diagnoses of rheumatoid arthritis, lupus, and Raynaud's syndrome. (R. 286.) Upon examination, Dr. Sinclair indicated that Plaintiff's symptomology and presentation is "atypical" for MS and he opined that Plaintiff's symptoms may be a manifestation of her Lupus and/or a possibility of myasthenia gravis. (R. 288.) Dr. Sinclair ordered Plaintiff to undergo testing relative to his suspicion that the MS diagnosis is not correct. (R. 288.)

On April 23, 2015, Plaintiff underwent MRI imaging of her cervical and thoracic spine. (R. 296-98.) Imaging of her cervical spine showed "C5-6 and C6-7 herniated discs with mild mass effect upon the cord" and "left posterior lateral neck venolymphatic confirmation." (R. 297.) The thoracic imaging showed disc herniation at T6-7 with slight contact to the right ventral cord and minimal herniated discs at T7-8 and T8-9. (R. 298.) Plaintiff returned to Dr. Chatpar on May 4, 2015 with continuing complaints of frequent headaches and arm pain. (R. 353.) On June 18, 2015, Plaintiff underwent a nerve conduction study. Dr. Sinclair noted that this "is an abnormal study with evidence on repetitive nerve stimulation for neuromuscular

junction dysfunction consistent with myasthenia gravis."
(R. 290.)  On June 22, 2015, Plaintiff followed up with Dr. Chatpar
regarding her positive ANA results and complained that she was
experiencing frequent weakness in her legs and that her "left arm
and left fingers 'jerk around' and shake often."  (R. 277, 356.)
Upon examination, Dr. Chatpar noted that Plaintiff's "feet [are]
tender on palpation."  (R. 278, 357.)

On August 13, 2015, Plaintiff complained to Dr. Sinclair
that she was suffering from muscle aches and muscle weakness.  (R.
284.)  Upon examination, Dr. Sinclair, after noting some
abnormalities in Plaintiff's motor skills and reflexes, diagnosed
Plaintiff's muscle weakness as caused by myasthenia gravis, rather
than Plaintiff's prior diagnosis of multiple sclerosis.  (R. 285-
86.)  On August 24, 2015, Plaintiff complained to Dr. Chatpar that
her "Raynauds has been flaring, fingers and toes are always cold."
(R. 359.)  Plaintiff also complained of constant facial pain,
tingling and frequent weakness in her legs, and that her left arm
and left fingers "jerk around" and shake often.  (R. 359.)  She
also complained that her medications were not alleviating her
symptoms.  (R. 359.)  Upon examination, Plaintiff's feet were
tender on palpation.  (R. 360.)

On October 1, 2016, Plaintiff first saw Dr. Sperandeo,
D.N.P., for a physical exam and reported that her last physical
exam was in 2014 but indicated that she was treating with

11

specialists since that time.  (R. 458.)  Plaintiff did not complain of headaches, nor change in strength or exercise tolerance but did report exercising two to three times per week.  (R. 458.)  Upon examination, Dr. Sperandeo noted "no pain in [Plaintiff's] muscles or joints, no limitation of range of motion, no paresthesias or numbness."  (R. 464.)  He also noted, neurologically, "no weakness, no tremor, no seizures, no changes in mentation, no ataxia." (R. 464.)  However, Dr. Sperandeo's assessment of Plaintiff includes the following conditions: Myasthenia Gravis, Lupus, Multiple Sclerosis, Raynaud's disease, Migraines, and Obesity.  (R. 465.) Dr. Sperandeo ordered lab work and a CT scan, continued Plaintiff's medications, and scheduled a follow up appointment in 7-10 days. (R. 465.)

Plaintiff then saw Dr. Sinclair on October 7, 2015 complaining of "frequent" and "severe" headaches.  (R. 406-07.) Upon examination, Dr. Sinclair noted that Plaintiff continues to have weakness in her legs, limited range of motion in her lower bilateral extremities, decreased sensation, and decreased reflexes.  (R. 407-08.)  Plaintiff returned to Dr. Sperandeo on October 13, 2016 to follow up on her testing.  (R. 466.) Dr. Sperandeo indicated that Plaintiff has, inter alia, high cholesterol, hypothyroidism, and hemangioma and ordered Plaintiff to continue her current medications.  (R. 472-73.)

On October 31, 2015, Dr. Herman conducted a psychiatric evaluation of Plaintiff. (R. 369.) Dr. Herman found evidence that Plaintiff suffers from mild to moderate limitations in appropriately dealing with stress but opined that these limitations "do not appear to be significant enough to interfere with [Plaintiff's] ability to function on a daily basis." (R. 371.) Rather, Dr. Herman found that Plaintiff's "vocational dysfunction is due to medical issues which are beyond the scope of this evaluation." (R. 371.)

Plaintiff saw Dr. Sinclair again on March 24, 2016 with complaints of "significant", "frequent", and "severe" headaches, cloudiness in her vision, a drooping of her right eyelid, and "frequent twitching" on her right side. (R. 403-04.) Upon examination, Dr. Sinclair noted that Plaintiff had right eye ptosis and protuberance laterally and decreased bilateral hip flexion. (R. 405.)

Plaintiff returned to Dr. Sperandeo on November 10, 2016 for a follow up relating to her thyroid and for further lab work. (R. 474-80.) Dr. Sperandeo notes no changes to Plaintiff's condition and his assessment continues to reflect diagnosis of: Hypothyroidism, Hypercholesterolemia, Abnormal Liver Enzymes, Myasthenia Gravis, Lupus, Multiple Sclerosis, Raynaud's disease, Migraines, and Obesity. (R. 479-80.)

13

On December 15, 2016, Plaintiff treated with Dr. Delgado for a psychiatric consultation.  (R. 445-48.)  Plaintiff reported that she was suffering symptoms of, _inter alia_, depression, anxiety, helplessness, hopelessness, sleep problems and was having difficulty performing activities of daily living.  (R. 445.)  Based on a mental status evaluation that showed psychomotor retardation, a constricted affect, a depressed mood, and helplessness thought content, Dr. Delgado diagnosed Plaintiff with moderate episodes of recurrent major depressive disorder.  (R. 447-48.)

Plaintiff saw Dr. Sinclair eight more times from 2016 to 2017, each time complaining of, _inter alia_, m17uscle aches, weakness, frequent double vision, and fatigue.  (R. 3/24/16 403-06; 4/8/16 400-03; 7/19/16 398-400; 9/12/16 395-98; 11/3/16 391-95; 1/18/17 387-91; 7/20/17 375-79; 2/28/17 383-87.)  Plaintiff also visited Dr. Chatpar five more times during the period June 20, 2016 through December 8, 2016 with complaints of tingling and "pins and needles" bilaterally in her hands and feet.  (R. 6/20/16 564; 8/4/16 568-73; 9/1/16 574-78; 10/20/16 579-83; 12/8/16 584-88.)

Plaintiff next saw Dr. Sperandeo on January 12, 2017 for medical clearance prior to a panniculectomy.[3]  (R. 496-502.)  She

---

[3] A panniculectomy is a surgical procedure to remove the "pannus"--excess skin and tissue from the lower abdomen.  Unlike a "tummy tuck," the panniculectomy does not tighten the abdominal muscles for a more cosmetic appearance, disqualifying it as a cosmetic

saw him again on March 15, 2017 with complaints of nausea, diarrhea and loss of appetite. (R. 503-09.) Plaintiff denied having headaches, joint pain, and anxiety although she did report depression for which she was taking Cymbalta and was going to start with Seroquel. (R. 508.)

On March 22, 2017 Plaintiff saw Dr. Sperandeo's associate, Dr. Jennifer Mullenburg, M.D., to review laboratory testing. (R. 510-16.) Plaintiff complained of depression, frequent frontal headaches, and difficulty breathing but denied having dizziness, visual changes, hearing loss or ringing ears, or any joint pain. (R. 515.) Dr. Mullenburg's assessment included the following diagnoses: Hypothyroidism, Myasthenia Gravis, Asthma, and Depression. (R. 515-16.)

Following her panniculectomy on May 4, 2017, Plaintiff saw Dr. Sperandeo on May 18, 2017 concerning a lump on her abdomen. (R. 525-32.) Upon examination, Dr. Sperandeo noted Plaintiff was "generally healthy" with no headaches, vision or hearing problems, and no pain in her muscles or joints. (R. 530.) Dr. Sperandeo ordered a CT scan of Plaintiff abdomen and pelvis. (R. 531.) On May 25, 2017 Plaintiff saw Dr. Sperandeo with complaints of difficulty breathing that worsened with exertion and improved with

procedure. American Society of Plastic Surgeons, www.plasticsurgery.org/reconstructive-procedures/panniculectomy, last visited on October 21, 2020.

rest.  (R. 533-39.)  He diagnosed her as suffering with seasonal allergies and Asthma in addition to her usual conditions.  (R. 538-39.)

On September 27, 2017, Dr. Shin, a neurologist, examined Plaintiff, who complained of "frequent 'skull crushing headaches,'" "severe fatigue, memory problems, and episodic 'flailing of her arms and legs.'"  (R. 450-55.)  Upon examination, Dr. Shin noted that Plaintiff did not appear in acute distress but concurred with the diagnosis of myasthenia gravis and concluded that Plaintiff's "[d]iffuse body pain may be small fiber neuropathy related to her underlying autoimmune disease."  (R. 454.)

Plaintiff also visited the emergency room on several occasions during the relevant time period.  On September 26, 2015, Plaintiff complained of headaches, nausea, and photosensitivity following her second infusion treatment for Myasthenia Gravis.  (R. 363-67.)  Plaintiff indicated her pain was a level 9 out of 10 on the pain scale.  (R. 363.)  After rest and upon examination, Plaintiff was discharged after several hours.

Plaintiff next was admitted to the Hospital on July 15, 2017 for uncontrollable "shaking" and "seizure-like" tremors.  (R. 488-91.)  Upon examination, Dr. Sunna Zia noted nothing remarkable other than a droop to Plaintiff's left eyelid and discharged Plaintiff the following day.  (R. 488-95.)

D.   <u>Opinion Evidence</u>

On June 17, 2015, Dr. Boulukos, Plaintiff's primary care doctor, completed a "Mental Capacity Questionnaire" and diagnosed Plaintiff with MS, asthma, generalized anxiety disorder, muscle weakness, insomnia, autoimmune disease (atypical), and neuropathy. (R. 276.)   She opined that Plaintiff was not mentally able to perform simple, repetitive tasks and that Plaintiff could not perform any work for eight hours per day, 40 hours per week, and fifty weeks per year.   (R. 276.)   Dr. Boulukos noted that the clinical findings supporting her opinion were myalgia, arthralgia, and 4/5 motor strength in all extremities.   (R. 276.)

Dr. Sinclair completed a "Physical Capacity Questionnaire" on June 24, 2015 providing the following objective and clinical findings: "The patient has weakness in the arms and legs on exam and abnormality on nerve conduction (repetitive nerve stimulation) consistent with neuromuscular junction dysfunction." (R. 280.)   Dr. Sinclair also indicated that Plaintiff would not be able to stand and/or walk for up to two hours in an eight-hour workday or sit for more than six hours in an eight-hour workday. (R. 280.)   He further opined that Plaintiff would not be able to lift or carry up to ten pounds occasionally or lift or carry "up to a few pounds" frequently.   (R. 280.)

On July 13, 2015, Dr. Chatpar completed a "Physical Capacity Questionnaire" wherein she indicated that Plaintiff would

17

not be able to stand and/or walk for up to two hours in an eight-hour workday or sit for more than six hours in an eight-hour workday.  (R. 281.)  She further opined that Plaintiff would not be able to lift or carry up to ten pounds occasionally or lift or carry "up to a few pounds" frequently.  (R. 281.)

III. The ALJ's Decision

         Initially, the ALJ found that Plaintiff meets the insured-status requirements of her claim through December 31, 2019.  (R. 17-18.)  Next, the ALJ applied the familiar five-step disability analysis and concluded that Plaintiff was not disabled from October 27, 2014, the alleged disability-onset date, through February 7, 2018, the date of her decision.  (R. 17-18); see 20 C.F.R. § 404.1520.  At steps one through three, the ALJ found that (1) Plaintiff had not engaged in substantial gainful activity since the alleged onset date (R. 18); (2) Plaintiff had severe impairments consisting of myasthenia gravis, lupus, degenerative disc disease, sleep apnea, and obesity (R. 18); and (3) these impairments did not meet or medically equal the severity of any of the impairments listed in Appendix 1 of the Social Security regulations, 20 C.F.R. §§ 404.1520(d), 404.1525, and 404.1526 (R. 19-21).  The ALJ then determined that Plaintiff had the residual functional capacity ("RFC")

> to perform sedentary work as defined in 20 CFR 404.1567(a), except [Plaintiff can]: occasional[ly] climb ramps or stairs; never climb ladders, ropes, or

scaffolds; occasional[ly] balance, stoop, crouch, kneel, [and] crawl; [have] occasional exposure to excessive vibration; [have] occasional exposure to moving mechanical parts; occasional[ly] operat[e] [] a motor vehicle; and have occasional exposure to unprotected heights.

(R. 21-22.)

Proceeding to steps four and five, the ALJ found that: (4) Plaintiff was able to perform "her past relevant work as an executive assistant (DOT # 169.167-010) [ ]; office manager (DOT # 169.167-034) [ ] and receptionist (DOT # 237.367-038) . . . ." (R. 28); and (5) upon comparing Plaintiff's RFC with the physical and mental demands of this work, the ALJ found that Plaintiff "is able to perform it as actually and generally performed" (R. 29). As a result, the ALJ determined that Plaintiff was not disabled. (R. 29.)

## DISCUSSION

### I.   Standard of Review

In reviewing the ruling of an ALJ, the Court does not determine de novo whether the plaintiff is entitled to disability benefits.  Thus, even if the Court may have reached a different decision, it must not substitute its own judgment for that of the ALJ.  See Jones v. Sullivan, 949 F.2d 57, 59 (2d Cir. 1991) (citations omitted).  If the Court finds that substantial evidence exists to support the Commissioner's decision, the decision will

be upheld, even if evidence to the contrary exists.  See Johnson
v. Barnhart, 269 F. Supp. 2d 82, 84 (E.D.N.Y. 2003).

## II.  Analysis

Plaintiff argues that "[t]he ALJ's RFC determination is
not supported by substantial evidence" because the ALJ did not
follow the treating physician rule and instead substituted "her
own lay person opinion to craft her RFC determination."  (See
Pl. Br. at 9-15, D.E. 9-1.)  Plaintiff also contends that the ALJ
erred by failing to find Plaintiff's Raynaud's Disease "severe" as
she never even addressed it or considered it as a "medically
determinable impairment." (Pl. Br. at 16-18.)  Finally, Plaintiff
avers that her "case was adjudicated by an improper and
unconstitutionally appointed ALJ and should be remanded for a new
hearing with a different and constitutionally appointed ALJ."
(Pl. Br. at 18-21.)

The Commissioner argues that the ALJ properly found that
Plaintiff was not disabled because:  (1) the ALJ correctly
concluded that Raynaud's Disease was not a "severe impairment"
(Comm'r Br., D.E. 13, at 16-22); (2) the ALJ's RFC finding is
supported by substantial evidence (Comm'r Br. at 22-27); and
(3) "Plaintiff waived her argument regarding the constitutionality
of the ALJ's appointment by failing to raise it at the
administrative level."  (Comm'r Br. at 27-35).

A.   <u>The ALJ Improperly Weighed the Opinion Evidence</u>

The "treating physician rule" provides that the medical opinions and reports of a claimant's treating physicians are to be given "special evidentiary weight."  <u>Clark v. Comm'r of Soc. Sec.</u>, 143 F.3d 115, 118 (2d Cir. 1998).  The regulations state:

> Generally, we give more weight to opinions from your treating sources . . . .  If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight.

20 C.F.R. § 404.1527(c)(2).[4]  Nevertheless, the opinion of a treating physician "need not be given controlling weight where [it is] contradicted by other substantial evidence in the record." <u>Molina v. Colvin</u>, No. 13-CV-4701, 2014 WL 3925303, at *2 (S.D.N.Y. Aug. 7, 2014) (internal quotation marks and citations omitted). When an ALJ does not afford controlling weight to the opinion of a treating physician, she must consider several factors:  "(1) the length of the treatment relationship and frequency of the examination; (2) the nature and extent of the treatment

---

[4] "While the Act was amended effective March 27, 2017 [to eliminate the treating physician rule], the Court reviews the ALJ's decision under the earlier regulations because the Plaintiff's application was filed before the new regulations went into effect."  <u>Williams v. Colvin</u>, No. 16-CV-2293, 2017 WL 3701480, at *1 (E.D.N.Y. Aug. 25, 2017); <u>see also</u> 20 C.F.R. § 404.1527 ("For claims filed (see § 404.614) before March 27, 2017, the rules in this section apply. For claims filed on or after March 27, 2017, the rules in § 404.1520c apply.").

relationship; (3) the extent to which the opinion is supported by medical and laboratory findings; (4) the physician's consistency with the record as a whole; and (5) whether the physician is a specialist." Schnetzler v. Astrue, 533 F. Supp. 2d 272, 286 (E.D.N.Y. 2008). The ALJ must also set forth "'good reasons' for not crediting the opinion of a plaintiff's treating physician." Id. "An application of the treating physician rule is sufficient when the ALJ provides 'good reasons' for discounting a treating physician's opinion that reflect in substance the factors as set forth in [Section] 404.1527(d)(2), even though the ALJ declines to examine the factors with explicit reference to the regulation." Crowell v. Comm'r of Soc. Sec., 705 F. App'x 34, 35 (2d Cir. 2017) ("While the ALJ did not explicitly discuss the treating physician rule, he nonetheless stated that the physician's opinion . . . was contradictory to the rest of the record evidence.").

Here, the ALJ gave "little weight" to all of the opinion evidence (R. 27-28),[5] without "good reasons" for so doing and despite that the opinions were largely consistent and were

---

[5] Similarly, the ALJ found that Dr. Herman's opinion, that Plaintiff has a "severe mental impairment," was not consistent with "the medical evidence as a whole." (R. 28.) However, Dr. Herman opined that Plaintiff suffers from mild to moderate limitations in appropriately dealing with stress and stated that these limitations "do not appear to be significant enough to interfere with [Plaintiff's] ability to function on a daily basis." (R. 371.) Rather, Dr. Herman found that Plaintiff's "vocational dysfunction is due to medical issues which are beyond the scope of this evaluation." (R. 371.)

provided, for the most part, by specialists who had treated Plaintiff for varying periods of time. First, the ALJ found that Dr. Sinclair's treatment notes after June 24, 2015 were inconsistent with his opinion that Plaintiff could not perform even sedentary work because she was unable to stand for two hours, sit for six hours, lift ten pounds occasionally or lift-up to a few pounds frequently. (R. 27, 280.) However, Dr. Sinclair's "records contain only raw medical evidence from each particular visit" and "do not assess [Plaintiff's] ability to engage in competitive work on a regular and continuing basis despite" her impairments. Stein v. Colvin, No. 15-CV-6753, 2016 WL 7334760, at *4 (W.D.N.Y. Dec. 19, 2016); see 20 C.F.R. § 416.945(b) (stating that the SSA will evaluate the claimant's ability to work on a "regular and continuing basis" when assessing his or her physical abilities). In any event, the treatment notes reflect that Plaintiff consistently complained that she was suffering from muscle aches and muscle weakness as well as frequent and severe headaches and his notes reflect his observations of some abnormalities in Plaintiff's motor skills as well as weakness in her arms and legs, limited range of motion in her lower bilateral extremities, decreased sensation, decreased reflexes, right eye ptosis and protuberance laterally and decreased bilateral hip flexion. (R. 284, 403-04, 406-08.) Specifically, the ALJ noted that Dr. Sinclair's opinion was inconsistent with Plaintiff's

description of activities reported to Dr. Sperandeo including "exercising 2-3 times a week and taking care of her children." (R. 27.)   However, Plaintiff reported such activities to Dr. Sperandeo during a general physical exam on October 1, 2016 (R. 458), over fifteen months after Dr. Sinclair's June 24, 2015 opinion (R. 280), and did not elaborate on the intensity of her exercise or the activities involved in caring for her children. Thus, it is not entirely clear that Dr. Sinclair's treatment notes and Physical Capacity Questionnaire are inconsistent.

Further, the ALJ assigned "little weight" to Dr. Sinclair's opinion, noting the short amount of time (three months) that he treated Plaintiff notwithstanding that Dr. Sinclair based his opinion on examinations that revealed weakness in Plaintiff's arms and legs along with nerve abnormalities.   The ALJ further discounted Dr. Sinclair's June 24, 2015 opinion given his subsequent determination that Plaintiff's symptoms were not a result of MS as she had been earlier and were diagnosed and were sufficient reasons to assign little weight to his opinion. (R. 27.)   However, the ALJ ignores that Plaintiff had seen him at least twice from April 8, 2015 through June 24, 2015, the date of Dr. Sinclair's opinion, and he had the results of Plaintiff's diagnostic testing and nerve conduction studies which revealed abnormalities.  (R. 286, 290, 296-98.)   In addition, although Dr. Sinclair doubted Plaintiff's prior MS diagnosis when he first

examined her on April 8, 2015 (R. 288), the ALJ concluded that his later finding that Plaintiff "does not have MS seems likely to have a dramatic impact on Dr. Sinclair's assessment of [ ] [Plaintiff's] functioning." (R. 27.) However, the June 24th opinion was after Plaintiff's June 18, 2015 nerve conduction study where Dr. Sinclair noted that Plaintiff's "is an abnormal study with evidence on repetitive nerve stimulation for neuromuscular junction dysfunction consistent with myasthenia gravis." (R. 290.) Thus, at the time of his June 24, 2015 opinion, his suspicion that Plaintiff suffered from myasthenia gravis, rather than MS, was confirmed.

Second, the ALJ also found that Dr. Chatpar's opinion was inconsistent with the "objective evidence and treatment notes" and assigned "little weight" because her recommended "conservative treatment" was "inconsistent with her opinion that [Plaintiff] has such severe exertional limitations." (R. 27-28.) However, discounting a treating physician's opinion as "conservative" is "not a 'good reason' to reject a treating physician's medical opinion." Destina v. Berryhill, No. 17-CV-2382, 2018 WL 4964103, at *6 (E.D.N.Y. Oct. 15, 2018) (citing Morris v. Colvin, No. 12-CV-5600, 2016 WL 7235710, at *9 (E.D.N.Y. Dec. 14, 2016)). "In this Circuit, the opinion of a treating physician is not 'to be discounted merely because he has recommended a conservative treatment regimen.'" Id. at *6 (quoting Burgess v. Astrue, 537

F.3d 117, 129 (2d Cir. 2008)) (subsequent citation omitted).  "Such a reason 'falls far short of the standard for contradictory evidence required to override the weight normally assigned the treating physician's opinion.'" Id. (quoting Shaw v. Chater, 221 F.3d 126, 134 (2d Cir. 2000)).  Moreover, the ALJ did not consider Dr. Chatpar's "frequency, length, nature, and extent of treatment," or her specialty as a rheumatologist, when assigning her opinion "little weight." Estrella v. Berryhill, 925 F.3d 90, 95 (2d Cir. 2019) (quoting Selian v. Astrue, 708 F.3d 409, 418 (2d Cir. 2013)) (alterations omitted).  Here, too, is not clear that Dr. Chatpar's treatment and progress notes and clinical findings are inconsistent with her the opinions.  Over the course of three years, Dr. Chatpar saw and examined Plaintiff numerous times, prescribed varying medications and treatments, observed tenderness, and analyzed blood and diagnostic tests indicative of Plaintiff's medical issues.

Third, the ALJ gave "little weight" to Dr. Boulukos's opinion because: (1) the opinion provided only a conclusory statement that claimant was disabled rather than a description of Plaintiff's functional limitations and (2) there is a "lack of supporting medical records." (R. 27.)  However, not only did the ALJ mischaracterize Dr. Boulukos's opinion, she did not detail the required factors as "good reason" to discount a treating physician's opinion.  First, the record reflects that Dr. Boulukos

was Plaintiff's primary care physician from June 6, 2011 through May 7, 2015, a significant period of time. (R. 276.) Although the ALJ correctly noted that treatment notes from Dr. Boulukos were absent from the record, she ignores that Dr. Boulukos's opinion is supported by medical and laboratory findings in the record and is consistent with the record as a whole and with the specialists' opinions. And, importantly, the opinion does include Plaintiff's functional limitations. Dr. Boulukos noted Plaintiff's motor functionality of 4/5 for all extremities. (R. 276.) The Court finds that the ALJ did not provide good reasons to discount the opinion of Dr. Boulukos.

Thus, the ALJ traversed the treating physician rule and remand is required for further proceedings consistent with this Memorandum and Order. On remand, the ALJ should "endeavor to obtain enough information to determine whether the opinion[s]" of Plaintiff's treating physicians are entitled to controlling weight. Murphy v. Saul, No. 17-CV-1757, 2019 WL 4752343, at *7 (E.D.N.Y. Sept. 30, 2019); Balodis v. Leavitt, 704 F. Supp. 2d 255, 268 (E.D.N.Y. 2010). The Court further "encourages the Commissioner to expressly address all the factors for evaluating opinion evidence in the SSA regulations." Hernandez v. Saul, No.

18-CV-0832, 2019 WL 4805211, at *4 n.7 (E.D.N.Y. Sept. 30, 2019)
(citing 20 C.F.R. § 404.1527(c)).[6]

    B.   Challenge to the ALJ's Appointment

        Plaintiff challenges the constitutionality of the ALJ's
appointment and cites to Lucia v. Securities and Exchange
Commission, -- U.S. --, 138 S. Ct. 2044, 2011, 201 L. Ed. 2d 464
(2018) where the Supreme Court held that ALJs employed by the
Securities and Exchange Commission are inferior officers who must
be properly appointed. (Pl. Br. at 18-21.) She requests a hearing
before a different and constitutionally appointed ALJ. The
Commissioner contends that "Plaintiff waived her argument
regarding the constitutionality of the ALJ's appointment by
failing to raise it at the administrative level." (Comm'r Br. at
27-35.)

        Courts have reached different conclusions as to whether
a plaintiff waives an Appointments Clause challenge by not raising
it at the administrative level. "[T]he vast majority of courts
that have considered this issue following Lucia [ ] have concluded
that exhaustion before the ALJ is required." Bonilla-Bukhari v.

---

[6] Given the Court's remand decision, it does not address
Plaintiff's other claims of error, including whether the ALJ erred
by failing to consider Plaintiff's Raynaud's Disease diagnosis as
a medically determinable impairment. However, although the ALJ
noted that she "must consider all of the claimant's impairments,
including impairments that are not severe (20 CFR 404.1520(e) and
404.1545; SSR 96-8p)" (R. 18), it is not clear whether she included
the Raynaud's Disease diagnosis in the decision.

Berryhill, 357 F. Supp. 3d 341, 351 (S.D.N.Y. 2019) (collecting cases) (concluding that the plaintiff "waived her Appointments Clause challenge"). However, the Court need not address this issue in light of the finding that remand for further proceedings is necessary. On remand, the Commissioner should consider whether reassignment to a new ALJ is warranted.

CONCLUSION

For the foregoing reasons, Plaintiff's motion (D.E. 9) is GRANTED as stated herein and the Commissioner's motion (D.E. 12) is DENIED. This matter is REMANDED for proceedings consistent with this Memorandum and Order.

The Clerk of the Court is directed to enter judgment accordingly and mark this case CLOSED.

SO ORDERED.

/s/ JOANNA SEYBERT
Joanna Seybert, U.S.D.J.

Dated:    October  22  , 2020
          Central Islip, New York